## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 19 2015, 8:26 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joshua Tarazona,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 19, 2015

Court of Appeals Case No.
49A05-1503-CR-92

Appeal from the Marion Superior
Court.
The Honorable Marc Rothenberg,
Judge.
Cause No. 49G02-1402-FB-8997

**Darden, Senior Judge**

# Statement of the Case

Joshua Tarazona appeals from his conviction of Class B felony criminal confinement,[1] contending that there is insufficient evidence to support his conviction. We affirm.

# Issue

The sole issue presented for our review is whether the incredible dubiosity rule applies such that Tarazona's conviction must be reversed.

# Facts and Procedural History

Tarazona, who was twenty-one years old, and H.P., who was twenty years old, had been in a relationship for approximately three years when they broke up after Tarazona's admission of infidelity. The two had shared an apartment, which Tarazona continued to live in after the break up, and the two continued to contribute to the remaining rental expense obligation. H.P. stayed with her mother or with friends, but per an agreement with Tarazona, left her belongings at the apartment as she was still paying her share of the rent there. They communicated via telephone after the break up, but H.P. remained steadfast in her decision not to reconcile with Tarazona, although he wished otherwise.

On the evening of February 21, 2014, H.P. stayed at a friend's house. The next day when she charged her cell phone, she discovered approximately ten text

---

[1] Ind. Code § 35-42-3-3(b)(2)(A) (2006).

messages from Tarazona. In the messages, Tarazona demanded to know where H.P. was; asked her to talk to him; and, after H.P. failed to respond, threatened to shoot himself. H.P. took Tarazona's threat seriously because she knew Tarazona owned two handguns he had purchased during their relationship and was trained on their proper use. Tarazona was actively enlisted in the Army National Guard assigned as a military police officer. Tarazona had also trained H.P. on the proper use of a handgun, and he frequently kept one holstered. The two used some of their limited financial resources to go to the shooting range for practice with the handguns.

[5] H.P. went to the apartment at approximately noon on February 22, 2014. When she entered the apartment, she found Tarazona sitting on the bed and sat down next to him. H.P. noticed that Tarazona seemed anxious. He asked her if they could reconcile their relationship. H.P. told him that she did not want to do so and instead wanted to get her things and leave. The two talked for approximately ten minutes before H.P. got up to take a shower to prepare for the rest of her day.

[6] Tarazona followed H.P. into the bathroom. As H.P. undressed and showered Tarazona continued to ask her about resolving their issues in order to maintain their relationship. After H.P. finished showering, she attempted to leave the bathroom, but could not because Tarazona blocked the way. H.P. could not get around Tarazona to leave the bathroom, although she asked him numerous times to move. Tarazona refused. After approximately ten minutes, during

which Tarazona continued to ask about resolving their issues, H.P. ultimately pushed past Tarazona to move toward the bedroom.

[7] H.P. entered the bedroom with Tarazona following her there and plugged her cell phone into the wall charger. At one point while H.P. was sitting on the bed dressing, Tarazona sat down next to her. He persisted in his requests to resolve their differences in order to reconcile. However, H.P. refused to reconcile and the conversation became more heated and the two began to argue. Once dressed, H.P. stood up and attempted to leave the bedroom. Tarazona blocked her exit standing face-to-face with her and insisting that they continue the conversation. For the next fifteen minutes, Tarazona either blocked or pushed H.P. back to prevent her from leaving the room.

[8] After a number of failed attempts to leave the bedroom, H.P. returned to the bed. Tarazona then grabbed a handgun he kept on a nightstand near the bedroom door where he stood. Tarazona began pacing back and forth in front of the doorway holding the handgun, which was pointed down toward the floor, crying, breathing hard, and telling H.P. that they could work out their differences. He pleaded for her to give him another chance.

[9] H.P. told Tarazona that she had spent the previous night at a male friend's house. Tarazona raised the handgun and pointed it at H.P. for a few seconds before pointing the handgun towards the floor again. H.P. attempted to take her cell phone off the charger to call her mother, but Tarazona grabbed the phone, threw it on the floor, and stomped on it. H.P. repeatedly asked

Tarazona to put the handgun down as she became more upset. Tarazona pointed the handgun to his head and asked H.P. how she would feel if he killed himself, and began a countdown as if ready to pull the trigger. H.P. repeated her cries for him to put down the handgun.

[10] Tarazona threw the handgun on the bed next to where H.P. was seated. She immediately got up, went to the other side of the bed to grab her jacket to leave the bedroom but was again blocked by Tarazona. The two continued to quarrel. Again, as she walked toward the bedroom door, Tarazona blocked the exit by holding onto furniture to prevent her from having access to the door. H.P. was unable to get through the doorway and the two began to push each other. Finally, Tarazona told H.P. if she wanted to leave, she would have to kill him. H.P. grabbed the other handgun from a nightstand, holding it in her right hand and pointing it downward. Tarazona grabbed and briefly choked her. The two struggled with the trigger of the handgun; Tarazona trying to place H.P.'s finger on it, and H.P. trying to avoid having her finger on the trigger. During the struggle, ultimately, H.P. shot Tarazona in the foot. He fell to the floor and crawled into the living room.

[11] H.P. called 911, telling the operator that she had shot Tarazona because he had tried to hurt her. Indianapolis Metropolitan Police Officers Josh Fritsche and Noel Gudat responded to the 911 dispatch. When they arrived at the apartment, the officers observed that H.P. was outside crying hysterically and talking with her mother on the cell phone. The officers located Tarazona inside the apartment on the living room floor with his foot elevated. The officers gave

Tarazona his *Miranda* warnings after which he told them that he made H.P. shoot him. At that point, since H.P. had been identified as the alleged shooter in a domestic dispute, the officers read the *Miranda* warnings to H.P., handcuffed her, and escorted her to a domestic violence detective for questioning.

[12] The State charged Tarazona with one count of Class D felony strangulation and one count of Class B felony criminal confinement. At the conclusion of his jury trial, Tarazona was found guilty of criminal confinement, but not guilty of strangulation. The trial court sentenced Tarazona to nine years of imprisonment, with three years suspended, two of which were to be served on probation. Tarazona now appeals.

## Discussion and Decision

[13] Tarazona argues that his conviction should be vacated because H.P.'s testimony was so dubious and contrary to the facts that it must be disregarded, leaving insufficient evidence to sustain his conviction. He contends that H.P. accused him of the offenses solely to avoid prosecution for her own actions.

[14] In order to convict Tarazona of criminal confinement as a Class B felony, the State was required to establish beyond a reasonable doubt that Tarazona knowingly or intentionally confined H.P. without her consent while armed with a deadly weapon. Ind. Code § 35-42-3-3. When reviewing a claim of insufficient evidence, we must consider only the probative evidence and reasonable inferences that support the judgment without reweighing the

evidence or assessing witness credibility, and determine whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Smith v. State*, 34 N.E.3d 1211, 1221 (Ind. 2015). We may impinge upon the jury's function of judging the credibility of a witness through the use of the incredible dubiosity rule. *Id.*

[15] As our supreme court has stated, "Application of the incredible dubiosity rule is limited to cases with very specific circumstances because we are extremely hesitant to invade the province of the jury." *Id.* Quoting a summarization from *Moore v. State*, 27 N.E.3d 749, 756 (Ind. 2015), the Supreme Court acknowledged that "to warrant application of the incredible dubiosity rule, there must be: '1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence.'" *Id.*

[16] H.P. testified that after she was finished dressing in the bedroom, Tarazona physically blocked her exit from the bedroom. As she sat on the bed, Tarazona grabbed a handgun that was on a nightstand near where he stood and began pacing back and forth in front of the doorway. At one point, Tarazona pointed the handgun at H.P. All of this occurred while H.P. repeatedly requested to leave and Tarazona refused to allow her to do so without first agreeing to reconcile with him. There was sufficient evidence to support Tarazona's conviction of Class B felony criminal confinement.

[17] Tarazona's claim that H.P.'s testimony was incredibly dubious fails in several respects. When first questioned by police officers, Tarazona stated that he made H.P. shoot him, corroborating a part of H.P.'s account. H.P.'s version of the events remained consistent from the time she called 911 through her testimony at trial. She claimed that she and Tarazona had been in the first significant romantic relationship for both of them for a period of three years before breaking up. In his own testimony, Tarazona acknowledged that his relationship with H.P. had become rocky. Further, Tarazona acknowledged that he was needy, irritating, and constant in his requests that H.P. reconcile with him, thus corroborating in part H.P.'s version of the events. H.P. explained that Tarazona wished to reconcile while she did not. Therefore, it is not inherently improbable that there would be a dispute between the two following the end of their relationship. H.P.'s account does not run counter to human experience such that no reasonable person could believe it. *See Campbell v. State*, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000) (incredibly dubious testimony runs counter to human experience).

[18] She testified that Tarazona refused to allow her to leave the bedroom and as they struggled over the handgun, he was shot in the foot. Officers saw red marks around H.P.'s neck, which were consistent with her claim that he had briefly choked her. H.P. stated that Tarazona had held a handgun while blocking her exit from the bedroom and had pointed it at her before throwing the handgun on the bed. Officers photographed a handgun on the bed in the bedroom at the apartment. Therefore, H.P.'s testimony was not inherently

improbable or contradictory and was corroborated in part by the testimony of what the officers observed and were told.

[19] Tarazona argues that H.P.'s testimony should be discredited because she had a motive to lie—avoiding prosecution for her own actions by fabricating that she was a victim of domestic violence. However, Tarazona had the opportunity to cross-examine H.P. and challenge her motivation to lie. Tarazona also claims that her testimony must have been coerced because she sought to avoid criminal charges. That argument is relevant to a challenge of H.P.'s credibility, but does not establish that she was coerced by anyone.

[20] Moreover, the fact that H.P. did not repeat her account of the struggle between the two over the handgun does not render her testimony incredibly dubious. H.P. gave her account of that struggle when asked about it on direct examination. However, on cross-examination, H.P. specifically responded to questions that were asked of her by the defense which did not include questioning about the struggle.

[21] Last, Tarazona argues that since the jury acquitted him of the strangulation charge, H.P.'s testimony as a whole must be incredibly dubious. We disagree. An acquittal on one count and a conviction on another count survives a claim of inconsistency if there is sufficient evidence to support the conviction. *Hoover v. State*, 918 N.E.2d 724, 730 (Ind. Ct. App. 2009), *trans. denied*. H.P. testified that when Tarazona had his hands around her throat and she was pinned against the wall, she could not breathe. However, she also stated that he

released her after only a few seconds and, that while his hands were around her throat she was yelling at him. Tarazona claimed that he did not choke her. Therefore, the discrepancy in the testimony was an issue for the trier of fact to resolve. Here, the jury found that the State did not meet its burden of proving beyond a reasonable doubt that Tarazona was guilty of strangulation. The fact that the jury may have believed H.P.'s testimony, but did not find that what she described rose beyond a reasonable doubt to the criminal offense of strangulation, does not render her testimony as a whole incredibly dubious.

## Conclusion

[22] In light of the foregoing, we affirm the trial court's judgment.

[23] Affirmed.

[24] Vaidik, C.J., and Robb, J., concur.