## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 15 2020, 7:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jessica L. Richert
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Dean Childers,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 15, 2020

Court of Appeals Case No.
20A-CR-58

Appeal from the Wayne Circuit Court

The Honorable David A. Kolger, Judge

Trial Court Cause No.
89C01-1701-MR-1

**Tavitas, Judge.**

# Case Summary

James Dean Childers appeals his conviction for murder. We affirm.

# Issues

Childers raises two issues, which we restate as:

I.    Whether the trial court properly admitted a
      statement made by Childers.

II.   Whether Childers' due process rights were
      violated.

# Facts

On the evening of January 14, 2017, Childers went to the Tally Ho bar in Richmond, and he was seen wearing a silver cross necklace. At some point, Childers left the Tally Ho bar and went to Mack's Bar in Richmond. Austin Sparks and his father, Michael Sparks, also went to Mack's Bar that evening. At some point, Tara Parsley and her friend, Taylor Strunk, also arrived at Mack's Bar.

Strunk and Austin began talking about Strunk's ex-boyfriend, Trey, and Austin's estranged wife; Austin became very upset. When Parsley and Strunk were ready to leave at approximately 1:30 a.m. on January 15, 2017, Austin wanted to go with the women and "hang out," but Parsley and Strunk refused Austin's request. Tr. Vol. III p. 12. The two women waited until Austin was

distracted while talking to someone else, and the pair left the bar. The women walked out the back door of the bar because the front door was broken. When they walked outside, Strunk saw Childers, whom she knew. As the women were running toward their vehicle, they noticed that Austin was following them. Childers also followed the women to their vehicle.

[5] As the women were trying to leave, Austin and Childers both tried to talk to Strunk. Austin pulled out a knife, waved it in the air, told Strunk "tell Trey that [Austin] had something for him," and then put the knife away. *Id.* at 15, 45. Childers said, "you never stabbed somebody in your life," and Austin responded, "do you know me, I don't know you, do you have a problem with me." *Id.* at 45. Childers was "kind of ignoring it" and trying to talk to Strunk and Parsley. *Id.* Strunk said that she needed to leave and that Childers and Austin needed to go back inside. Strunk then closed her door, and the women drove away.

[6] According to Parsley, "it looked like [Austin and Childers] were having a discussion . . . as [the women] were pulling off and it didn't look like a friendly conversation." *Id.* at 15-16. According to Strunk, it appeared that Childers was "talking sh**." *Id.* As the women left, Parsley called Henry Farris in the bar "to tell Austin's dad that he might want to come and get Austin because there might be an argument or confrontation . . . ." *Id.* at 16.

[7] Near the same time, Morton Maish and his girlfriend, Chelsea Reynolds, arrived in the area, parked their vehicle, and walked in the alley toward the bar.

Maish and Reynolds heard two angry voices in the alley. Maish could only see Austin; because it was dark, Maish could not see the person standing behind Austin. Reynolds, however, testified that she saw both Austin and Childers. Austin said to Maish, "who does this guy think he is uh, talking shit to me . . . ." *Id.* at 62. Maish and Reynolds continued toward the bar and saw several people, including Austin's father, Michael, run out of the bar toward Austin's location.

[8] When Michael and the others arrived outside, Childers "was standing up on [Austin], right in front of him, and right against him." *Id.* at 109. Michael "thr[e]w [Childers] away from [Austin]." *Id.* Michael saw that "Austin was standing there, his eyes [were] all bugged out . . . . He's standing there his eyes are just froze. He couldn't say a word. [Michael] kept tapping him on his jaw, Austin, Austin, Austin. There was no response. He never spoke a word." *Id.* at 110. Austin fell to the ground, and Michael discovered that Austin's jacket was covered in blood. Childers got into his vehicle and left.

[9] Austin sustained two stab wounds to his chest, one of which damaged his heart, resulting in his death. The events leading up to and following the stabbing were recorded on the bar's security cameras; the actual altercation and stabbing, however, were outside the view of the cameras.

[10] William Mills ("William") is Childers' stepfather and brother to James Mills ("Mills"). On January 15, 2017, William called Mills and said that Childers was "in trouble" and "needed a place to stay." Tr. Vol. III p. 244. Mills drove

to Richmond from Cincinnati, Ohio, to pick up Childers. Childers stayed with Mills for five to seven days in Ohio. While Childers stayed with Mills, Childers admitted to Mills that he stabbed Austin. Mills also saw that Childers had a handgun and a couple boxes of ammunition. Childers told Mills that he "was not going back to Indiana" and that he would "hold court in the street," which Mills testified meant "if the cops come to wherever he's at he's going to shoot it out." *Id.* at 250. Mills was on probation or parole at the time and did not want a gun in his house. Mills advised Childers that he "had to leave" and that he was taking Childers to a relative's house in Richmond. Tr. Vol. IV p. 2. Mills told Childers to put his gun in the backseat of Mills' vehicle, which Childers did. Mills contacted the Richmond Police Department to report that he was bringing Childers back to Richmond, and officers stopped Mills' vehicle and arrested Childers.

[11] A silver cross necklace was located at the crime scene outside Mack's Bar on the ground near the location Austin fell. DNA testing of a sample found on the cross demonstrated that it was "at least one trillion times more likely if it originated from Austin Sparks, James Childers and two unknown individuals than if it originated from four unknown, unrelated, non-tested individuals." Tr. Vol. II p. 228. The analysis provided "strong support for the proposition that Austin Sparks and James Childers [were] contributors to the DNA profile." *Id.* DNA testing of a swab from the chain of the necklace demonstrated that it was "at least one trillion times more likely if it originated from Austin Sparks, James Childers and another individual than if it originated from three unknown,

unrelated, untested individuals." *Id.* The analysis provided "strong support for the proposition that James Childers and Austin Sparks [were] contributors to the DNA profile." *Id.*

[12] In January 2017, the State charged Childers with murder. A September 2018 trial, however, ended with a hung jury and a mistrial. At that trial, Mills testified that Childers did not admit to stabbing Austin.

[13] Childers was retried in November 2019. During the jury trial, the trial court held a preliminary hearing outside the presence of the jury to review several aspects of Mills' probable testimony, including Childers' statement about holding court in the street. Tr. Vol. III p. 220. The trial court ruled that Childers' statement was admissible as evidence of flight.

[14] On cross-examination, Mills testified that he decided approximately one month before the second trial that he planned to change his testimony and he reported this to the deputy prosecutor at that time. After Mills' testimony was completed, Childers argued to the trial court that his due process rights were violated by the State knowingly using false testimony to obtain a conviction. The deputy prosecutor informed the trial court that, contrary to Mills' testimony: (1) Mills informed the deputy prosecutor about his changed testimony on the Friday before the trial began; and (2) the deputy prosecutor informed Childers' counsel of the changed testimony on Sunday before the trial began. The trial court took the issue under advisement. The parties then

reached an agreement, and the next morning, a stipulation was read to the jury as follows:

> The parties stipulate the witness James Mills informed the State of Indiana that he decided to change his testimony on Friday, November 15th not three weeks ago as he testified. The parties further stipulate that this communication was initiated by the State of Indiana and not the witness himself.

Tr. Vol. IV p. 107.

[15] The jury found Childers guilty of murder. The trial court sentenced Childers to sixty-two years in the Department of Correction. Childers now appeals.

# Analysis

## I. *Admissibility of Evidence*

[16] Childers first challenges the trial court's admission of Childers' statement regarding holding court in the street. "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Clark v. State,* 994 N.E.2d 252, 259-60 (Ind. 2013). "We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* at 260.

[17] Although the holding court in the street statement was addressed by the parties during a preliminary hearing immediately before Mills' testimony, Childers did not object to the statement during Mills' testimony. By failing to make a

contemporaneous objection, Childers failed to preserve his challenge to the admissibility of the evidence. *See Brown v. State*, 929 N.E.2d 204, 206-07 (Ind. 2010) ("A contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal, whether or not the appellant has filed a pretrial motion to suppress."). According, this issue is waived.

[18] Waiver notwithstanding, Childers argues that his statement was inadmissible under Indiana Evidence Rule 403, which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." According to Childers, the statement was unfairly prejudicial, confused the issues, and misled the jury.

[19] Mills testified that Childers said he "was not going back to Indiana" and that he would "hold court in the street," which Mills interpreted as meaning, "if the cops come to wherever he's at he's going to shoot it out." Tr. Vol. III at 250. When Childers was arrested, he was in possession of a gun and more than one hundred bullets. At a preliminary hearing, the trial court found that Childers' statement was admissible because it was similar to evidence of flight.[1]

---

[1] The State argues that the trial court did not clearly rule on the admissibility of this statement. During the 403 hearing, the trial court, however, stated: "I think I'm going to let his statements about holding (inaudible) in the street come in and like because again, I think that's the same that's a *Lee v. State* issue I think. But you both could argue whatever you feel uh, is appropriate there but . . . ." Tr. Vol. III p. 239. The trial court

[20] Our Supreme Court has held that "'[e]vidence of flight may be considered as circumstantial evidence of consciousness of guilt.'" *Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015) (quoting *Brown v. State*, 563 N.E.2d 103, 107 (Ind. 1990)). Additionally, "'[e]vidence of an attempt to avoid arrest [also] tends to show guilt.'" *Id.* (quoting *Wilson v. State*, 455 N.E.2d 1120, 1123 (Ind. 1983)).

[21] Childers argues that the prospect of a law enforcement-related shooting is "almost certain to evoke strong emotions." Appellant's Br. p. 12. The State argues that, "[t]hough the statement at issue speaks to flight and Childers' desire to avoid arrest, it is unlikely the jury overvalued the statement when viewed within the context of the other damaging evidence presented." Appellee's Br. pp. 16-17. We agree with the State. The jury was already aware of substantial evidence that Childers fought with Austin immediately before Austin died and that Childers fled Indiana soon thereafter. The statement at issue was relevant evidence of flight and further efforts to evade arrest, and we find no indication that the statement unduly prejudiced Childers or would have confused or misled the jury. The trial court properly admitted the statement.

## II. Due Process

[22] Childers next argues that his due process rights were violated because the State presented false evidence. According to Childers, Mills falsely testified on cross-

---

earlier cited *Lee v. State*, 439 N.E.2d 603, 604 (Ind. 1982), for the proposition that "evidence of an attempted escape is relevant to show consciousness of guilt."

examination regarding the date he informed the State of his change in testimony and the State did not correct the testimony on redirect examination.

[23] "It is well established that 'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Smith v. State*, 34 N.E.3d 1211, 1219 (Ind. 2015) (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959)). "[A] defendant's Fourteenth Amendment due process rights are violated when the prosecution knowingly uses false testimony without disclosing its falsity or attempting to correct it." *Id.* In such a case, "the proper question is: did the State impermissibly use false testimony to obtain a conviction in violation of a defendant's due process rights?" *Id.* at 1220. We focus on "whether the jury's ability to assess all of the facts and the credibility of the witnesses supplying those facts has been impeded to the unfair disadvantage of the defendant." *Id.* "Active or passive behavior by the State that hinders the jury's ability to effectively act as the fact-finder is impermissible and may violate a defendant's due process rights." *Id.*

[24] Our Supreme Court addressed alleged false testimony in *Smith v. State*, 34 N.E.3d 1211 (Ind. 2015). There, two people burglarized a Dollar General store. Nicole Greenlee, the store manager, was charged and pleaded guilty. At her guilty plea hearing, Greenlee testified that she entered the store using the security codes and took the money. Later, at Smith's trial, Greenlee testified that Smith entered the store and that Greenlee acted as the lookout. Greenlee

admitted that she told the police multiple stories regarding the burglary and that she gave a different story at her guilty plea. Smith moved for a mistrial, which the trial court denied.

[25] On appeal, Smith argued Greenlee's trial testimony "cannot be viewed as simply inconsistent with her previously sworn testimony at the plea hearing." *Id.* at 1219. According to Smith: "One must be false if the other is to be true. . . . The State should not be able to 'cherry pick' which statement under oath is the truth and which is the perjury." *Id.* The State argued that "Greenlee gave inconsistent statements, which were fully presented to the jury . . . . [thus] [t]he State did not knowingly use false testimony; instead, a jury performed its duty in making a credibility determination." *Id.*

[26] Our Supreme Court held that "the State did not impair the defendant's due process rights by any misuse of Greenlee's testimony." *Id.* at 1220.

> To the contrary, the State notified opposing counsel and the trial court of Greenlee's conflicting testimony and proactively drew attention to the discrepancies in Greenlee's testimony multiple times throughout the trial, thus permitting the jury to fully function as an informed fact finder. And the defense was enabled to, and did, actively emphasize such inconsistencies to the defendant's advantage. We find no violation of the defendant's due process rights from the State's use of Greenlee's testimony in this case.

*Id.* at 1220-21.

[27]     Here, Mills testified on cross-examination that he informed the State approximately a month before the second trial that he was changing his testimony. On redirect examination, the State did not attempt to clarify or correct Mills' testimony regarding when the State was notified of the change. After Mills' testimony, Childers brought the matter to the trial court's attention, and the parties later entered into a stipulation. The following morning, this stipulation was read to the jury:

> The parties stipulate the witness James Mills informed the State of Indiana that he decided to change his testimony on Friday, November 15th not three weeks ago as he testified. The parties further stipulate that this communication was initiated by the State of Indiana and not the witness himself.

Tr. Vol. IV p. 107.

[28]     As in *Smith*, we find no violation of Childers' due process rights here. After Childers brought the timing discrepancy to the trial court's attention, the parties entered into a stipulation that was read to the jury and corrected Mills' testimony regarding when Mills notified the State that he planned to change his prior testimony. Mills' false testimony regarding the timing of his changed testimony was not allowed to go uncorrected. Rather, Childers actively participated in correcting Mills' testimony and expressly agreed to the stipulation read to the jury. Moreover, during closing arguments, Childers emphasized all of the discrepancies in Mills' testimony to Childers' advantage. Under these circumstances, we cannot say that the "jury's ability to assess all of the facts and the credibility of the witnesses supplying those facts" was

"impeded to the unfair disadvantage" of Childers. *See Smith*, 34 N.E.3d at 1220. Childers' argument fails.

# Conclusion

The trial court did not abuse its discretion by admitting Childers' statement regarding holding court in the street, and Childers' due process rights were not violated by Mills' testimony. We affirm.

Affirmed.

Kirsch, J., and Pyle, J., concur.