## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT

Ruth Johnson
Michael R. Fisher
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Richard Green Burns,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 31, 2015

Court of Appeals Case No.
49A02-1505-CR-348

Appeal from the
Marion Superior Court

The Honorable
Grant W. Hawkins, Judge

Trial Court Cause No.
49G05-1403-MR-14307

**Kirsch, Judge.**

[1]     Richard Green Burns ("Burns") was convicted after a jury trial of murder,[1] a felony, and attempted murder,[2] a Class A felony and was sentenced to fifty-five years for murder and thirty-five years for attempted murder with the sentences ordered to be served consecutively for an aggregate sentence of eighty-five years.  On appeal, Burns raises the following restated issues:

> I.  Whether the State presented sufficient evidence to support his convictions for murder and attempted murder; and

> II.  Whether his eighty-five-year sentence is inappropriate in light of the nature of the offense and the character of the offender.

[2]     We affirm.

## Facts and Procedural History

[3]     On March 18, 2014, Burns's father, also named Richard Burns ("Richard"), was celebrating his birthday.  Richard spent the day at his home in Indianapolis, Indiana, and that night, he was sitting in his bedroom, drinking beer, and watching television, while his grandson, Timmy Moorman ("Moorman"), slept downstairs in the basement, in a space he had converted into a bedroom.  At the same time, Richard's friend of more than thirty years,

---

[1] *See* Ind. Code § 35-42-1-1.

[2] *See* Ind. Code §§ 35-42-1-1, 35-41-5-1.  We note that, effective July 1, 2014, a new version of these criminal statutes were enacted.  Because Burns committed his crimes prior to July 1, 2014, we will apply the statutes in effect at the time he committed his offenses.

Sherman Wagers ("Wagers"), was awake and watching television in a space in the garage he had converted into an apartment.

[4] In the early morning hours of March 19, Burns came to Wagers's door and asked Wagers for the keys to the main house. Richard and Wagers were the only ones with keys to the house, and visitors would often come to Wagers to use his set of keys. After Burns retrieved the keys, Wagers watched him enter the main house. Within fifteen minutes, Burns returned to Wagers's apartment. Burns entered, struck Wagers in the head with a pistol, and then shot Wagers twice in the left side of the chest from close range. Burns then left the apartment and returned to the main house.

[5] Once inside the house, Burns entered Richard's bedroom holding Wagers's set of keys. Burns told Richard that he had just killed Wagers and Moorman. Richard did not believe Burns because Richard had heard no gun shots. While he was talking to Richard, Burns was holding a gun, and he pointed it at Richard several times and threatened to kill him. Burns was also talking about his mother, who had died six years prior, and Richard knew that "when [Burns] starts talking about his mom he's upset." *Tr.* at 144. Richard was able to calm Burns down and walked Burns out to his vehicle. Richard told Burns to take care of himself, and Burns drove away.

[6] After Burns left, Richard yelled to Wagers and asked him to come over and celebrate his birthday. Wagers responded that Burns had shot him. After hearing this, Richard then believed Burns's earlier admission and went to check

on Moorman in the basement. Richard found Moorman lying on the bed and discovered that he had been shot once in the head. Moorman later died from the gunshot wound. Wagers survived his injuries. Ballistic evidence later showed that the same gun was used to shoot both Moorman and Wagers, although it was never recovered.

[7] On March 21, 2014, the State charged Burns with murder and Class A felony attempted murder. A jury trial was held, at the conclusion of which, Burns was found guilty of both charges. The trial court sentenced Burns to fifty-five years for his murder conviction and thirty-five years for his attempted murder conviction and ordered the sentences to be served consecutively for a total sentence of eighty-five years. Burns now appeals.

## Discussion and Decision

## I. Sufficient Evidence

[8] Burns argues that insufficient evidence was presented to support both his conviction for murder and his conviction for attempted murder. The deferential standard of review for sufficiency claims is well settled. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Cunningham v. State*, 870 N.E.2d 552, 553 (Ind. Ct. App. 2007). We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from that evidence. *Fuentes v. State*, 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied*. We will not disturb the jury's verdict if there is substantial evidence of probative value to

support it. *Id*. We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Tooley v. State*, 911 N.E.2d 721, 724-25 (Ind. Ct. App. 2009), *trans. denied*. As the reviewing court, we respect "the jury's exclusive province to weigh conflicting evidence." *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005).

### A. Murder

[9] Burns argues that the State did not present sufficient evidence to support his conviction for murder because the testimony of Richard was incredibly dubious. Burns specifically contends that Richard's testimony was vague, inconsistent, and internally contradictory. He further claims that the most serious problem with Richard's testimony was that it demonstrated that Richard had a very serious memory impairment and could not recall much of what he had previously told the police or the attorneys who questioned him at the deposition. Burns asserts that, although the incredible dubiosity rule is restricted to cases where only a single witness testifies, and here both Richard and Wagers testified against him, it nevertheless seems logical that the rule should also apply where a single witness testified to the critical elements of a single charge, as occurred here.

[10] The incredible dubiosity rule provides that a court may impinge on the jury's responsibility to judge witness credibility only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Carter v. State*, 31 N.E.3d 17, 30-31 (Ind. Ct. App. 2015) (citing *Love v. State,* 761 N.E.2d 806, 810 (Ind. 2002)), *trans. denied*. Application

of this rule is rare, and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Id*. at 31 (quotations omitted). The rule applies only when a witness contradicts herself or himself in a single statement or while testifying, and does not apply to conflicts between multiple statements. *Id*. (citing *Manuel v. State,* 971 N.E.2d 1262, 1271 (Ind. Ct. App. 2012)). Therefore, to warrant application of the incredible dubiosity rule, there must be: (1) a sole testifying witness; (2) testimony that is inherently contradictory, equivocal, or the result of coercion; and (3) a complete absence of circumstantial evidence. *Smith v. State*, 34 N.E.3d 1211, 1221 (Ind. 2015). "Cases where we have found testimony inherently improbable have involved situations either where the facts as alleged 'could not have happened as described by the victim and be consistent with the laws of nature or human experience,' or where the witness was so equivocal about the act charged that her uncorroborated and coerced testimony 'was riddled with doubt about its trustworthiness.'" *Id*. (quoting *Watkins v. State,* 571 N.E.2d 1262, 1265 (Ind. Ct. App. 1991), *aff'd in relevant part,* 575 N.E.2d 624 (Ind. 1991)).

[11]   In the present case, Richard was not the sole testifying witness to Burns's crimes. Wagers testified that Burns came to his garage apartment and retrieved the keys to the main house from him. Wagers then watched as Burns entered the main house, which was the site of Moorman's murder. Within fifteen minutes, Burns returned to Wagers's apartment and hit Wagers in the head with a gun and shot him twice in the chest from close range. This testimony

from Wagers placed Burns at the scene of Moorman's murder around the time of Moorman's death as suggested by the evidence. Where there are multiple testifying witnesses, even if not eyewitnesses, the incredible dubiosity rule does not apply. *See Moore v. State*, 27 N.E.3d 749, 757-58 (Ind. 2015) (holding that, when an eyewitness's testimony is challenged as being incredibly dubious, the rule does not apply when there are corroborating witnesses).

[12] Additionally, Richard's testimony was not inherently contradictory. In order to be found inherently contradictory, the testimony must be inconsistent within itself and not with other evidence or prior testimony. *Smith*, 34 N.E.3d at 1221. Richard's testimony did not contain internal contradictions; rather, all of the contradictions that Burns points to in his brief were either contradictions with statements made outside of the trial or contradictions regarding what prior statements Richard remembered. Burns does not specify any inconsistencies within Richard's testimony, only inconsistencies with previous out-of-court statements. In his trial testimony, Richard consistently stated that Burns told him that Burns had killed Moorman and Wagers and that Burns had a gun in his possession while confessing to these crimes. *Tr.* at 142-44. Richard did not contradict himself on this information, and although he may have contradicted himself about his out-of-court statements, this is irrelevant to the application of the incredible dubiosity rule. As to Richard's lack of memory of his prior statements to the police and in his deposition, although his testimony did indicate problems with his memory, the incredible dubiosity rule has not been

applied in such situations. Here, Richard's memory issues were presented to the jury, and defense counsel had ample opportunity to impeach Richard.

[13] Further, in addition to Richard's testimony, circumstantial evidence of Burns's guilt was presented to the jury. Wagers's testimony placed Burns at the place of Moorman's murder at the time the murder occurred. Ballistic evidence was presented that the same gun was used to shoot both Wagers and Moorman. Given that more than one witness testified, Richard's testimony was not inherently contradictory, and circumstantial evidence of Burns's guilt was presented, we conclude that the incredible dubiosity rule does not apply, and sufficient evidence was presented to support Burns's conviction for murder.

### B. Attempted Murder

[14] Burns next argues that insufficient evidence was presented to support his conviction for attempted murder. He claims that the evidence did not support the element that Burns acted with the specific intent to kill Wagers. Burns asserts that there was a lack of medical evidence as to the location of Wagers's wounds and the track of the bullets to indicate that the shots were fired in a manner likely to cause death or serious injury.

[15] In order to convict Burns of attempted murder, the State was required to prove beyond a reasonable doubt that he, acting with the specific intent to kill, engaged in conduct that constitutes a substantial step toward the commission of murder. Ind. Code §§ 35-42-1-1, 35-41-5-1. Intent to kill may be inferred from the nature of the attack and the circumstances surrounding the crime as well as

from the use of a deadly weapon in a manner likely to cause death or great bodily harm. *Amos v. State*, 896 N.E.2d 1163, 1171 (Ind. Ct. App. 2008) (citing *Kiefer v. State,* 761 N.E.2d 802, 805 (Ind. 2002)), *trans. denied.* Indiana courts have held that discharging a weapon in the direction of a victim is substantial evidence from which the jury could infer intent to kill. *Fuentes*, 10 N.E.3d at 75 (citing *Corbin v. State*, 840 N.E.2d 424, 429 (Ind. Ct. App. 2006)).

[16] Here, Burns used a gun to first hit Wagers in the head and then to shoot him twice in the left side of his chest at close range. After shooting Wagers, Burns went into the main house and told Richard that he had just killed Wagers and Moorman. This belief by Burns that he had killed Wagers is further proof of his intent to kill Wagers when he shot him. Additionally, when Burns was speaking to Richard, he showed him Wagers's set of keys and stated, "that's how I got them, I killed him." *Tr.* at 142. We conclude that the evidence presented showed that Burns used the gun in a manner likely to cause death or serious bodily injury, and the jury could infer that he acted with the specific intent to kill Wagers when he shot him in the chest. Sufficient evidence was presented to support Burns's conviction for attempted murder.

## II. Inappropriate Sentence

[17] Under Indiana Appellate Rule 7(B), "we may revise any sentence authorized by statute if we deem it to be inappropriate in light of the nature of the offense and the character of the offender." *Corbally v. State*, 5 N.E.3d 463, 471 (Ind. Ct. App. 2014). The question under Appellate Rule 7(B) is not whether another

sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate. *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). It is the defendant's burden on appeal to persuade the reviewing court that the sentence imposed by the trial court is inappropriate. *Chappell v. State,* 966 N.E.2d 124, 133 (Ind. Ct. App. 2012), *trans. denied.*

[18] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224.

[19] Burns contends that his sentence is inappropriate in light of the nature of the offense and the character of the offender. Specifically, he asserts that his sentence is inappropriate as to the nature of the offense because this was a senseless crime that can only be explained "by the emotional factor" suggested by Richard when he testified that Burns was talking about his mom who had passed away six years prior and that "usually when he starts talking about his mom he's upset." *Tr.* at 144. Burns also claims that his sentence is inappropriate in light of his character because he has no criminal record, a child to care for, and a record of consistent employment.

[20] Burns was convicted of murder and Class A felony attempted murder. "A person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years." Ind. Code § 35-50-2-3(a). "(a) A person who commits a Class A felony shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years." Ind. Code § 35-50-2-4(a). The trial court sentenced Burns to the advisory term of fifty-five years for his murder conviction and the advisory term of thirty years for his attempted murder conviction and ordered the sentences to be served consecutively for an aggregate sentence of eighty-five years.

[21] Considering the nature of the offense, Burns shot two defenseless people without provocation. He murdered Moorman, his nephew, by shooting him in the head while Moorman slept and attempted to kill Wagers by shooting him twice in the chest. Although Burns did not kill Wagers, his statements to Richard indicated that he believed that he had. Additionally, Burns pointed his gun at Richard and threatened his father several times while speaking to him. Further, although Burns calls his crimes senseless in order to suggest that they were motivated by his mental health issues, no evidence of any mental health condition was presented.

[22] As to Burns's character, while it is true that he has no criminal record, his present crimes of killing his nephew and attempting to kill a long-time family friend without provocation demonstrates his poor character. Based on the

nature of the offense and the character of the offender, we do not believe that Burns's sentence is inappropriate. We, therefore, affirm his sentence.

[23] Affirmed.

Mathias, J., and Brown, J., concur.