## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 09 2019, 6:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Mark K. Phillips
M. Robert Phillips
Boonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Isaiah Albert Hagan,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 9, 2019

Court of Appeals Case No.
18A-CR-1953

Appeal from the Warrick Circuit Court

The Honorable Greg A. Granger, Judge

Trial Court Cause No.
87C01-1705-MR-203

**Bailey, Judge.**

# Case Summary

Following a jury trial, Isaiah Albert Hagan ("Hagan") was convicted of several offenses: Murder, a felony;[1] Murder While Committing or Attempting to Commit Robbery, a felony;[2] Robbery Resulting in Serious Bodily Injury, a Level 2 felony;[3] and Obstruction of Justice, a Level 6 felony.[4] Hagan presents several appellate issues, which we revise and restate as follows:

I. Whether the trial court abused its discretion when making certain evidentiary rulings, including admitting statements Hagan made to his mother, an employee of the Warrick County Sheriff's Department, after Hagan had invoked the right to remain silent during a police interrogation.

II. Whether the State hindered the jury's ability to effectively act as the fact-finder.

III. Whether Hagan was deprived of an impartial judge.

We conclude Hagan has not identified reversible error. However, three of his convictions rely on the same evidence—that Hagan shot his victim—violating principles of double jeopardy. We affirm in part, reverse in part, and remand with instructions to remedy the violation. In doing so, we note that because

---

[1] Ind. Code § 35-42-1-1.

[2] I.C. § 35-42-1-1.

[3] I.C. § 35-42-5-1.

[4] I.C. § 35-44.1-2-2.

Hagan agreed to a fixed sentence of sixty years to avoid the possibility of life imprisonment without parole, our disposition does not affect his sentence.

# Facts and Procedural History

[3] On April 24, 2017, the body of Halee Rathgeber ("Rathgeber") was found in a parking lot in rural Warrick County, next to a bloody blue towel. She died from a gunshot wound to the head. On the day Rathgeber was found, Hagan—who lived with his mother Donna Hagan ("Donna") and father Wandel Hagan ("Wandel")—told Donna he had been with Rathgeber the previous day. Donna was a long-time employee of the Warrick County Sheriff's Department, employed at the Warrick County Jail. She suggested that Hagan speak with law enforcement to help with the investigation, which Hagan did. Law enforcement later searched the residence that Hagan, Donna, and Wandel shared. The search produced a blue towel—the same brand as the towel next to Rathgeber. Law enforcement also discovered that a handgun was missing.

[4] The investigation led to an interview with Hagan on April 26, 2017, at the start of which Detective Paul Kruse ("Detective Kruse") read line-by-line from a form containing an advisement of rights. This form also contained a Waiver of Rights section, which Hagan signed. On April 29, 2017, Detective Kruse again met with Hagan, who agreed to another interview at the Sheriff's Department. On the way to the interview, Detective Kruse reminded Hagan "of the waiver that he had signed" and "asked if he recalled those rights." Tr. Vol. II at 153.

Hagan said that he understood. Before the interview began, Detective Kruse obtained a blank copy of the advisement form. Hagan again signed the waiver.

[5] During the interview, Hagan said he had driven Rathgeber to the parking lot where her body was found—contradicting a prior statement that he dropped her off elsewhere. Hagan also said he had thrown away Rathgeber's phone after finding it in his car. At some point, Hagan said he wanted to talk with Donna. Hagan eventually said he was done talking. Law enforcement then arranged a meeting with Donna, who was on duty. Donna—in full uniform—met with Hagan in a room at the Sheriff's Department. This meeting was not recorded, and Hagan was not given additional advisements prior to meeting with Donna.

[6] The State later charged Hagan with two counts of Murder—alleging, in one count, that Hagan had murdered Rathgeber while committing or attempting to commit Robbery. The State also charged Hagan with Level 2 felony Robbery Resulting in Serious Bodily Injury and Level 6 felony Obstruction of Justice. In addition to these counts, the State filed an enhancement seeking a sentence of life imprisonment without parole.[5] A jury trial began in early May 2018, but resulted in a mistrial. A second jury trial commenced later that month.

[7] At trial, Donna testified about her meeting with Hagan. At the meeting, Hagan told Donna that he accidentally shot Rathgeber. Hagan also told Donna that he disposed of the gun in a dumpster behind a liquor store. Despite that

---

[5] I.C. § 35-50-2-9.

assertion of accident, there was evidence at trial that Hagan had tried to cover his tracks—sending Rathgeber a text message well after discarding her phone. There was also evidence that Rathgeber owed Hagan money, and that Hagan owed Wandel money. The morning Rathgeber was found dead, Hagan put $210 on the counter for Wandel. Later that day, Hagan tried to sell concert tickets, claiming he was selling them for Rathgeber. Eventually, Rathgeber's wallet was found along the side of a road. The wallet had no paper bills inside.

[8] The jury found Hagan guilty of the four substantive counts. Hagan and the State then reached an agreement whereby Hagan would avoid life without parole, instead serving a sentence of sixty years in the Indiana Department of Correction. The trial court sentenced Hagan in accordance with the agreement.

[9] Hagan now appeals.

# Discussion and Decision

## Evidentiary Rulings

### Admission of Statements to Donna

[10] Hagan challenges the denial of a pretrial motion to suppress evidence. Because Hagan is appealing after a completed trial, we reframe this issue as "a request to review the court's decision to admit the evidence at trial." *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). In general, we review evidentiary rulings for an abuse of discretion. *Timberlake v. State*, 690 N.E.2d 243, 255 (Ind. 1997), *cert. denied*. "An abuse of discretion occurs when the ruling is clearly against the

logic and effect of the facts and circumstances." *Snow v. State*, 77 N.E.3d 173, 176 (Ind. 2017). We will affirm an evidentiary ruling "if it is sustainable on any basis in the record." *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998).

[11] Hagan challenges the admission of his statements to Donna. However, because Hagan failed to contemporaneously object to the admission of these statements, he has waived this issue for appellate review. *See Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) ("A contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal, whether or not the appellant has filed a pretrial motion to suppress."). "A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred." *Id.* This exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006).

[12] According to Hagan, his statements to Donna were inadmissible because they were obtained in violation of the Fifth Amendment to the United States Constitution. Hagan directs us to *Miranda v. Arizona,* wherein the U.S. Supreme Court held that a custodial interrogation jeopardizes "the privilege against self-incrimination" conferred by the Fifth Amendment. 384 U.S. 436, 478 (1966). To protect this privilege, evidence elicited through a custodial interrogation is admissible against the defendant only if he received adequate warnings and "knowingly and intelligently" waived his rights. *Id.* at 479. Moreover, *Miranda*

and its progeny protect the right to cut off police questioning. *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). To safeguard this right, when the accused invokes the right to remain silent, "[t]he police must cease questioning immediately and may resume questioning only after the passage of a significant amount of time and after giving a fresh set of *Miranda* warnings." *Pilarski v. State*, 635 N.E.2d 166, 170 (Ind. 1994). As to the admissibility of statements obtained after the accused invoked the right to remain silent, "[t]he burden remains on the State to show the police scrupulously honored the accused's right to remain silent." *Moore v. State*, 498 N.E.2d 1, 10 (Ind. 1986).

[13] Custodial interrogation "refers to questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Pasco v. State*, 563 N.E.2d 587, 593 (Ind. 1990). Moreover, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). At bottom, "*Miranda*'s premise is that 'the interaction of custody and official interrogation' creates the danger of coercion." *D.Z. v. State*, 100 N.E.3d 246, 249 (Ind. 2018) (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). Importantly, however, "that coercion 'is determined from the perspective of the suspect.'" *Id.* (quoting *Perkins*, 496 U.S. at 296). Therefore, the U.S. Supreme Court has "reject[ed] the argument that *Miranda* warnings are required

whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Id.* at 297. Indeed, *Miranda* concerns "are not present" when the accused "speaks freely to someone" whom he does not believe is an agent of the police. *Id.* at 296. In other words, "an agency relationship implicates *Miranda* only if the suspect is aware enough of the underlying police involvement to create a 'coercive atmosphere.'" *D.Z.*, 100 N.E.3d at 249 (quoting *Perkins*, 496 U.S. at 296). "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

[14] Evidentiary rulings involving *Miranda* present "a mixed question of fact and law." *State v. Ruiz*, No. 19S-CR-336, 2019 WL 2336619, at *3 (Ind. June 3, 2019). To the extent the ruling turns on a determination of fact, we will not reweigh the evidence, and will consider conflicting evidence in a light most favorable to the ruling. *Id.* However, to the extent the ruling turns on a question of law, our review is *de novo*. *Id.*; *cf. Carpenter*, 18 N.E.3d at 1001.

[15] During the April 29 interview with Detective Kruse, Hagan invoked his right to remain silent by telling Detective Kruse he was done talking. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). At that point, Detective Kruse stopped interrogating Hagan but proceeded to arrange a meeting with Donna. Hagan asserts Donna "was being used as an agent of the State" and that he was

entitled to an advisement that statements to Donna could be used against him.[6] Br. of Appellant at 22. Hagan characterizes the meeting as "encouraged and set up by the Sheriff's Department." *Id.* at 21. He alleges the police attempted to "circumvent *Miranda* by sending in [Donna] to question him," *id.*, and that arranging the meeting "demonstrates coercion, trickery and deceit," *id.* at 22.

[16] Yet, there is evidence that Hagan insisted on meeting with Donna. At one point, Hagan said, "I don't want to lie to my mom anymore." App. Vol. 2 at 78. Detective Kruse tried to persuade Hagan to first explain everything to him, telling Hagan that Detective Kruse would then arrange a meeting with Donna. Hagan declined, saying: "I would like to be able to talk to [Donna] first, sir. If I'm under arrest, then I understand, but I would like to be able to talk to her first." *Id.* at 79. This exchange indicates Hagan viewed a conversation with Donna as a personal conversation with his mother, not with an agent of the police. Moreover, Detective Kruse testified he did not give instructions to Donna before the meeting—and although law enforcement later asked Donna about the conversation, Donna testified she did not feel obligated to meet with Hagan and would have met with Hagan even if she did not work for the Sheriff's Department. Further, Donna's description of the meeting suggests the conversation was not the result of questioning but instead somewhat one-sided:

---

[6] Hagan also asserts Donna was entitled to an advisement because she could have faced charges had she withheld pertinent information, but Hagan cannot obtain relief for the purported violation of Donna's rights. *See, e.g.*, *Adler v. State*, 225 N.E.2d 171, 172 (1967) ("Constitutional rights are personal, and violation of a third party's constitutional rights cannot be claimed by a defendant in his trial.").

"Um, [he] came out and, um, he was crying and upset, um, telling me that he was innocent, and he didn't do this. . . . [H]e said other things, but he was so upset I didn't understand everything that he said." Tr. Vol. VII at 15.

[17] Regardless of the employment relationship between Donna and the Sheriff's Department, there is evidence indicating Hagan volunteered the incriminating statements during a personal, private meeting with his mother. Because "[c]oercion is determined from the perspective of the suspect," *Perkins*, 496 U.S. at 297, it is inapposite whether law enforcement arranged the meeting with the goal of eliciting incriminating statements, *see id.* ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."). Ultimately, viewing the evidence most favorable to the evidentiary ruling, we cannot say Hagan made the incriminating statements under improperly coercive circumstances. Moreover, we cannot say law enforcement failed to scrupulously honor Hagan's right to remain silent by arranging a requested meeting with Donna. We conclude *Miranda* required no additional advisements, and we discern no error—let alone fundamental error—in the admission of the statements.[7]

---

[7] Hagan has directed us only to the Fifth Amendment to the United States Constitution and to the attendant procedural safeguards articulated in *Miranda*. Nevertheless, federal principles of due process independently require exclusion of "confessions that were obtained involuntarily." *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *see also D.M. v. State*, 949 N.E.2d 327, 332-33 (Ind. 2011). The "due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Courts look to "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Id.* (quoting *Schneckloth*, 412 U.S. at 226). The Indiana Supreme Court has explained that "[t]he issues of voluntariness of a waiver [of rights] and voluntariness of a confession are

# Exclusion of Evidence

[18] Hagan directs us to certain evidentiary decisions. He points out he was not permitted to elicit testimony about a rumor that someone else killed Rathgeber. Hearsay—which is generally inadmissible, Ind. Evidence Rule 802—is "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted," Evid. R. 801(c). A rumor is hearsay, and we discern no applicable exception to the rule against hearsay evidence. Next, Hagan points out he was not permitted to ask a witness who the witness thought killed Rathgeber. Yet, pursuant to Indiana Evidence Rule 704, "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case." Thus, we are not persuaded the trial court abused its discretion by limiting cross-examination into these areas.

[19] Hagan also directs us to the exclusion of two videos. The first was prepared by an unidentified person and used by Special Agent Kevin Horan of the Federal Bureau of Investigation ("Agent Horan") early in the investigation. This video purportedly depicts the location of cellphones over time, displaying movements on a map. Agent Horan used the video to form a preliminary opinion about the movements of Hagan's and Rathgeber's cellphones, but later reached a different opinion about the movements. Hagan now argues the video was admissible,

similar in that they both require evaluation of the totality of the circumstances," but that "they are separate issues and should be presented, argued, and analyzed as such." *D.M.*, 949 N.E.2d at 334 n.10. Hagan has not presented this separate issue. Nonetheless, for the reasons already discussed, we conclude that admission of the statements to Donna did not run afoul of principles of due process.

claiming it "clearly demonstrates" that Hagan and Rathgeber "were nowhere near each other" at a pertinent point in time. Br. of Appellant at 45. However, we conclude the video was not relevant because there was no evidence the video was accurate or the preparer used reliable methods to map the locations. *See* Evid. R. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Thus, there was no abuse of discretion in exclusion. Evid. R. 402 ("Irrelevant evidence is not admissible.").

[20] The second video showed the person rumored to have killed Rathgeber inside a car wielding a gun. The video cuts to another man in the car putting something blue on his tongue, at which point someone offscreen says: "Acid. Whoa." Ex. S. At trial, Hagan asserted he was "not offering it to prove whether what's in the video is accurate" but instead to question the adequacy of the investigation into the person with the gun. Tr. Vol. IX at 217. Yet, Indiana Evidence Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The proffered video goes beyond connecting a one-time suspect with a weapon—admission of the video posed a risk of exposing the jury to prohibited evidence. A trial court has latitude to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Evid. R. 403. Here, Hagan had already elicited

testimony about the third-party suspect, offered a possible motive, and explored why law enforcement stopped investigating the person. The video lacked probative value. There was no abuse of discretion in excluding this evidence.

[21] Hagan directs us to a line of cases analyzing whether evidentiary rulings deprived a defendant of "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). He argues that principles of due process entitle him to present exculpatory evidence and present a theory of third-party guilt. Yet, we have concluded that the curtailment of cross-examination and the exclusion of the videos was proper under the Indiana Rules of Evidence. The U.S. Supreme Court has noted: "Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013). In *Nevada*, the Court cited four cases where it had identified a constitutional violation despite a proffered justification under a state rule of evidence—in each case, the State either "did not even attempt to explain the reason for its rule" or the evidentiary rule itself was not defensible. *Id.* (noting one rule "did not rationally serve any discernible purpose," another was "arbitrary," and a third "could not be rationally defended"). As the instant evidentiary rulings were justified under classic principles of evidence, we conclude the challenged rulings did not violate the right to due process. *See also Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (explaining that a prior holding that exclusion of certain evidence violated constitutional rights "rested not on a theory that all 'competent,

reliable evidence' must be admitted, but rather on the ground that the . . . sole rationale for the exclusion . . . was wrong"). In any case, Hagan was permitted to present his theory of third-party guilt despite adverse evidentiary rulings.[8]

## Reliance Upon Testimony

[22] Hagan alleges the State knowingly relied on false testimony.[9] Because Hagan did not assert this claim at trial, we review only for fundamental error. *See, e.g.*, *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009).

[23] The State may not knowingly rely on false evidence. *E.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "Active or passive behavior by the State that hinders the jury's ability to effectively act as the fact-finder is impermissible and may violate a defendant's due process rights." *Smith v. State*, 34 N.E.3d 1211, 1220 (Ind. 2015). "[T]he case law in this area focuses on whether the jury's ability to assess all of the facts and the credibility of the witnesses supplying those facts has been impeded to the unfair disadvantage of the defendant." *Id.*

---

[8] Hagan suggests the State has an independent "duty to introduce exculpatory evidence" at trial. Reply Br. at 33. We are aware of no such duty. Rather, a trial is an adversarial proceeding—and, as the U.S. Supreme Court has explained, even the accused "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana*, 518 U.S. at 42 (alteration in original) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).

[9] Hagan also asserts that certain witnesses gave incredibly dubious testimony. To obtain relief under "the incredible dubiosity rule, there must be: '1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence.'" *Smith v. State*, 34 N.E.3d 1211, 1221 (Ind. 2015) (quoting *Moore v. State*, 27 N.E.3d 749, 756 (Ind. 2015)). Because there were multiple witnesses, this rule is inapplicable.

[24] Hagan claims Donna lied at trial. He draws our attention to allegedly inconsistent statements Donna made before the trial, contending Donna must have been lying at trial because she had not previously said Hagan admitted to accidentally shooting Rathgeber. Yet, Donna gave vague pretrial statements—relaying, for example, that Hagan "said that he would never intentionally hurt somebody." Tr. Vol. VII at 23. Donna's trial testimony was not *per se* incompatible with her pretrial statements. Moreover, even if pretrial statements were wholly incompatible with trial testimony, the existence of inconsistent statements "does not inescapably lead to the conclusion that [the witness] was lying" on the stand. *Wallace v. State*, 474 N.E.2d 1006, 1008 (Ind. 1985).

[25] Hagan also directs us to trial testimony from a police officer, who said he heard—from Wandel—that Hagan told Donna it was an accident. Hagan claims the officer must have been lying, and suggests the State must have known as much, because this information was not contained in discovery. Hagan further asserts that his parents "acted in collusion with one another in an attempt to interfere with the evidence to be adduced at trial," directing us to evidence Donna and Wandel at one point discussed trial testimony. Br. of Appellant at 26. Moreover, Hagan speculates that "[t]he State clearly took advantage of [Donna's] propensity for lying; her fear of losing her job; or her belief that she could outsmart the system by concocting a story that she believed created a barrier to the conviction of her son." *Id.* at 25. Yet, Hagan ultimately falls short of demonstrating the State *knew* witnesses were giving false testimony at trial. Further, to the extent witnesses gave inconsistent statements regarding

what Hagan told Donna, Hagan subjected witnesses to vigorous cross-examination on this issue. Indeed, his cross-examination strategy often focused on impeachment through prior statements. Thus, we cannot say the jury was impeded in its ability to fully function as an informed fact finder. *See Smith*, 34 N.E.3d at 1220-21 (noting, when finding no due process violation, "the defense was enabled to, and did, actively emphasize such inconsistencies to the defendant's advantage"). Hagan has not demonstrated fundamental error.

# Trial Court Judge

[26] "A trial before an impartial judge is an essential element of due process." *Everling v. State*, 929 N.E.2d 1281, 1287 (Ind. 2010) (citing *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009)). Indeed, justice "requires that litigants (be they civil or criminal) receive equal opportunity to present their case to an impartial factfinder." *Bedolla v. State*, No. 19S-PC-328, 2019 WL 2264236, at *4 (Ind. May 28, 2019). Yet, merely asserting bias "does not make it so." *Smith v. State*, 770 N.E.2d 818, 823 (Ind. 2002). The law presumes a judge is unbiased. *Id.* "[T]o rebut that presumption, a defendant must establish from the judge's conduct actual bias or prejudice that places the defendant in jeopardy." *Id.* A defendant makes this showing "only where there is an undisputed claim or where the judge expressed an opinion of the controversy over which the judge was presiding." *Id.* "The mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing." *Voss v. State*, 856 N.E.2d 1211, 1217 (Ind. 2006).

Hagan identifies several ways the trial court judge allegedly displayed partiality, claiming this is a non-exhaustive list.[10] We address these contentions in turn.

## Pre-trial Confinement

Hagan points out that, before trial, the judge ordered that Hagan be confined in the Pike County Jail—approximately one hour by car from Warrick County—and be transported to the Warrick County Jail three days per week for potential meetings with counsel. Hagan suggests that, through this arrangement, the judge intended to interfere with Hagan's ability to meet with local counsel and prepare his defense. Yet, the record supplies a neutral goal, which was to avoid having Hagan confined in the Warrick County Jail while Donna was working.[11]

## Appointed Counsel

Hagan notes that the judge initially appointed defense attorneys who worked at separate firms. Hagan baldly suggests one attorney was appointed because her "law partner . . . served as Campaign Manager" for the judge's campaign. Br. of Appellant at 30. This suggestion is not well taken. Nonetheless, this pretrial matter does not demonstrate the judge was biased against Hagan.

---

[10] Hagan also alleges, without citation to the record, that the judge was incompetent due to illness. As Hagan has provided no support for this claim apart from the unverified assertions of counsel in briefing, we discern no proper basis for reversal.

[11] Hagan appears to separately contend that this pretrial arrangement was tantamount to the complete denial of the assistance of counsel, resulting in presumed prejudice under *United States v. Cronic*, 466 U.S. 648 (1984). Yet, Hagan has not demonstrated that he was deprived of counsel. Indeed, although the arrangement could have posed an obstacle to impromptu in-person meetings, Hagan does not suggest he lacked the ability to communicate with counsel on the telephone if counsel was ever unable to travel to Pike County.

## Adverse Rulings

[30] Hagan revives argument that he was entitled to pretrial release under Criminal Rule 4(A) because of delays that should not have been attributed to him. Yet, an adverse ruling does not demonstrate bias. *See Voss*, 856 N.E.2d at 1217. Similarly, to the extent Hagan directs us to adverse rulings concerning—*inter alia*—the admissibility of evidence and the handling of evidence by the jury, he has not demonstrated the rulings were animated by partiality to the State.[12]

## Redaction of Jury Questionnaires

[31] Hagan claims that "[u]ntil days before the second trial, the trial court ordered jury questionnaires to be redacted thereby preventing the defense from engaging in meaningful examination of potential jurors." Br. of Appellant at 34. Yet, Hagan does not assert the judge gave the State unredacted questionnaires while withholding them from Hagan. Rather, Hagan points out that "[t]he State joined in on at least one of these motions." *Id.* Thus, we discern no partiality.

## Treatment of Counsel

[32] Hagan asserts the judge demonstrated bias through the treatment of his counsel, directing us to different points of the trial. He claims that when counsel was

---

[12] Hagan focuses on whether the judge compromised the integrity of evidence by allowing the jury to handle exhibits, purportedly affecting future testing of evidence. Assuming *arguendo* the judge was indifferent to risk of contamination, the judge had no way of knowing the outcome of the trial. Thus, the judge would have had no way of knowing which party would be prejudiced by an inability to seek reliable testing in the future.

trying to supplement argument on a motion, the judge told him to sit down.[13] Yet, the record reflects it was not the judge who said "sit down" but instead counsel, with the remark directed toward co-counsel. Tr. Vol. IX at 76. Hagan also asserts that when he "complained that the trial judge was doing nothing to safeguard Hagan's rights, the trial judge rose and walked out of the courtroom." Br. of Appellant at 33. Even if abrupt, this action was outside the presence of the jury. Moreover, shortly before the recess, counsel had interrupted the judge on several occasions and the judge had asked counsel to use a different tone in argument to the court. "We afford trial judges ample 'latitude to run the courtroom and maintain discipline and control of the trial.'" *In re J.K.*, 30 N.E.3d 695, 698 (Ind. 2015) (quoting *Timberlake*, 690 N.E.2d at 256). The judge's decision to recess does not evince bias.

[33] Hagan also points out that the judge questioned whether his counsel needed a requested bathroom break, despite having previously let a prosecutor leave for the bathroom without asking for a recess. Hagan argues this handling of bathroom breaks reflected disparate treatment of counsel. Yet, where the prosecutor left without requesting a recess, Hagan was seeking a recess. The judge questioned whether a break was necessary in light of a recent recess.

---

[13] Hagan draws our attention to the treatment of his counsel during argument in support of a motion for mistrial. Although Hagan provides background concerning the grounds for this motion, he articulates no appellate argument of entitlement to mistrial. We therefore do not further address the denial of this motion.

Although it might have been better to avoid inquiry into urgency of bathroom breaks, we discern nothing more than an attempt to keep the trial moving.

[34] Next, Hagan directs us to an exchange that took place after the judge observed counsel make a remark under his breath. The judge interrupted counsel and asked that he repeat the remark, at one point asking counsel whether he wanted to be held in contempt. Counsel eventually told the trial court that he had "asked my client and my [co-counsel] why you were arguing with me. That's what I asked." Tr. Vol. VI at 211. The judge then allowed counsel to proceed with argument. Hagan argues this exchange demonstrates judicial bias. Yet, it appears the judge initiated the exchange because it was concerned counsel made a contemptuous remark. "Contempt powers are necessary to protect the orderly administration of justice and maintain the authority and dignity of the court." *Johnson v. State*, 426 N.E.2d 104, 106 (Ind. Ct. App. 1981). "Where immediate action is necessary to protect those interests, the court's interests outweigh a defendant's due process right to a neutral and detached bench." *Smith v. State*, 893 N.E.2d 1149, 1153 (Ind. Ct. App. 2008).

[35] Hagan directs us to several other exchanges and also generally asserts the trial court made "public derogatory comments directed toward defense counsel." Br. of Appellant at 35. We have reviewed the cited instances and are satisfied Hagan was at no point placed in jeopardy through the treatment of his counsel.

## Discovery Standard

[36] Hagan alleges the judge "held Hagan to a different standard with regard to discovery." *Id.* at 34. Contrary to Appellate Rule 46(A)(8)(a), Hagan provides no citation to the record to support his claim. Nevertheless, the essence of the argument seems to be that, upon the State's request, Hagan willingly provided details about intended witnesses and exhibits. Yet, when Hagan allegedly did not receive reciprocal information, the judge would not order the State to provide that information. Hagan does not allege the State was obligated to volunteer this information, and we discern no bias in declining to order the State to do something just because Hagan volunteered additional detail.

[37] Hagan presents other allegations of bias—weaving the allegations into other arguments or otherwise making "catchall" allegations. We have carefully reviewed the record, evaluating the allegations individually and as a whole. We conclude Hagan failed to rebut the presumption the judge was impartial.

## Double Jeopardy

[38] Hagan has not directed us to reversible error. However, our review of the record reveals violations of the principles of double jeopardy, which we may address *sua sponte* when the parties have not done so. *See Whitham v. State*, 49 N.E.3d 162, 168 (Ind. Ct. App. 2015), *trans. denied*. These violations arise from three convictions—upon which the court entered judgment of conviction—that rely on evidence Hagan shot Rathgeber: (1) Murder; (2) Murder While Committing or Attempting to Commit Robbery; and (3) Robbery Resulting in

Serious Bodily Injury. *See Richardson v. State*, 717 N.E.2d 32, 53 (Ind. 1999) (explaining the "actual evidence" test for double jeopardy violations). We may remedy a double jeopardy violation "by reducing [a] conviction to a less serious form of the same offense if doing so will eliminate the violation." *Id.* at 54. To cure the instant violations, we remand with instructions to vacate the conviction of Murder While Committing or Attempting to Commit Robbery and to revise the conviction of Robbery Resulting in Serious Bodily Injury to the lesser-included offense of Theft, as a Class A misdemeanor. We otherwise affirm the remaining convictions and the sentence.[14]

# Conclusion

[39] The trial court did not abuse its discretion by admitting statements Hagan made to his mother. The trial court did not abuse its discretion by curtailing lines of cross-examination or by excluding two videos, and those evidentiary rulings did not violate principles of due process. Hagan has not demonstrated that the State hindered the jury's ability to effectively act as the fact-finder or that he was denied an impartial judge. However, because three convictions relied upon the same evidence, we remand with instructions to remedy the double jeopardy violation.

---

[14] Hagan bargained for a sixty-year sentence to avoid a possible sentence of life without parole. Hagan expressly reserved the right to appeal his convictions but has waived the right to appeal his sentence. *See, e.g.*, *Games v. State*, 743 N.E.2d 1132, 1135 (Ind. 2001) (discussing waiver by bargaining for an agreed sentence).

Affirmed in part, reversed in part, and remanded with instructions.

Riley, J., and Pyle, J., concur.